1805.

## Griggs v. Dodge.

In the Court below,

CYREL DODGE, *Plaintiff ;* DAVID GRIGGS, and SARAH, his Wife, *Defendants.*

There may be, by will, a remainder over of personal property.

The testator devised one third part of his estate, consisting mostly of personal property, to his wife, *for her use and benefit, so long as she should remain his widow,* and then devised the whole of his estate to his children ; held that this was sufficient to create a remainder over.

After the termination of the particular estate by the marriage of the widow, *account* will lie to recover the property limited over.

THIS was an action of account, demanding, " That to " the plaintiff the defendants render their reasonable ac- " count, during the time that they, or either of them, joint- " ly, or severally, have been the plaintiff's bailiffs and recei- " vers." The declaration stated, that the plaintiff was the son, and the defendant Sarah, the wife, of Nehemiah Dodge. On the 21st day of April, 1795, Nehemiah made his will, and therein gave to Sarah the use of one third part of the whole of his real and personal estate, to be received by her after his decease, to enjoy the same so long as she should remain his widow. He also gave to the plaintiff one eighth part, and two thirds of another eighth part, of the whole of his estate. By sundry other devises and bequests he disposed of the whole of his estate ; and appointed the plaintiff and Sarah his executors. In the month of April, 1796, he died, possessed of considerable real estate, and also of personal estate to the amount of £1585 : 6 : 8 lawful money. The executors accepted their appointment, and exhibited the will to the Judge of Probate, before whom it was proved, and by whom it was approved. Sarah then and there accepted of the provisions in her behalf made by the testator in his will, in lieu of all legal claims that she might have upon his estate ; and his estate was by the executors actually settled according to his directions contained in his will. The declaration further stated, that Sarah, while the widow of the testator, at diverse times between his decease and the 1st day of January, 1800, was the bailiff and receiv- er of the plaintiff of one third part of the personal estate of the testator, consisting of various articles and securities particularly described in the declaration, amounting to the

1805.

GRIGGS
*v.*
DODGE.

sum of £478 : 16 : 3 lawful money ; and received the same, to have the use thereof, until she should cease to be his widow, and then to account with the plaintiff for one eighth, and two thirds of another eighth part thereof, amounting to the sum of £99 : 15 : 0 1-4 lawful money, when she should be afterwards thereto requested. The plaintiff then averred, that on the 31st day of December, 1799, Sarah intermarried with the defendant, Griggs, and now is his lawful wife ; the whole of the property came into his hands ; and they thereby became jointly accountable to the plaintiff for his proportion.

There was a plea in bar, reciting the will, which, so far as relates to this case, is as follows : " As touching such " worldly estate as it hath pleased God to bless me with in " this life, I give and dispose of the same in the following " manner, viz. First, I give and bequeath unto my beloved " wife, Sarah Dodge, one third of the whole of my estate, " for her use and benefit, so long as she remains my widow. " *Item*, I give to my son, Cyrel Dodge, one eighth part, and " two thirds of another eight part of my estate. *Item*, I " give to my son, Ezra Dodge, one eighth part, and one " third of another eighth part of my estate. *Item*, I give to " my son, Nehemiah Dodge, one eighth part of my estate. " *Item*, I give to my son, John Dodge, one eighth part of " my estate. *Item*, I give to my son, Erastus Dodge, one " eighth part of my estate. *Item*, I give to my son, Abel " Palmer Dodge, one eighth part of my estate. *Item*, I " give to my daughter, Eunice Lyon, one half of one " eighth part of my estate, excepting twenty five pounds. " *Item*, I give my daughter, Deborah Dodge, one half of " one eighth part of my estate, with an addition of twenty " five pounds, which is to be deducted from my daughter " Lyon's abovementioned. And I do hereby constitute my " son, Cyrel Dodge, and my beloved wife, Sarah Dodge, " my sole executors." The plea then averred, " that in " and by force of said will the one third part of the move- " able estate of said Nehemiah, of which he died seized,

1805.

GRIGGS
*v.*
DODGE.

" did, at the time of his death, vest in Sarah, in her own
" right, and she had good right by law to have and hold
" the same to herself, being not accountable to any one
" therefor ; and as such, the distributors of said estate did
" set the several articles, which are mentioned in the plain-
" tiff's declaration, being one third of said Nehemiah's per-
" sonal estate, and no more, to her, in her own right, in
" fee, according to the terms of the will ; and she did
" dispose of the same, while she was sole, and widow of
" said Nehemiah, for her use and benefit, as she had good
" right by law to do."

The plaintiff replied, that Sarah, previous to her inter-
marriage with Griggs, sold the articles of personal estate,
and collected the securities, for the purpose of changing
the nature of the property ; a small part of the same, much
less than the interest of the securities, was actually expended
by her, while she was the widow of the testator, for her sup-
port ; but the whole of the avails of the property, upon the
intermarriage, came into the possession of Griggs.

A Demurrer to this replication terminated the pleadings.
It was adjudged by the Superior Court, that the replica-
tion was sufficient, and that the defendants do account.

The general error was assigned.

*Dwight* and *William Perkins*, for the plaintiff in error.

Three questions arise, in this case, each of which must
be determined against the plaintiff in error, or the judg-
ment of the Court below must be reversed.

I. Can there be, in this State, a remainder over of per-
sonal estate ?—If so,

II. Are the terms of the will, in this case, sufficient to
create such remainder ?—If so,

III. Can the action which has been brought, under the circumstances of this case, be maintained?

1. In England, at common law, such limitation was void. (a) A gift of a personal chattel, to use and improve generally, or for an uncertain time, remainder over to a third person, was considered absolute; and the chattel was as effectually the property of the first donee, as though the words of the gift had been absolute. (b) It is said, in the argument of the case of *Bigge* v. *Bensley*, (c) that thus the law remained, till the decision of *Matthew Manning's* case, (d) in the 7th of James I.; and in that, the Court were not unanimous. In the same reign, and but thirteen years afterwards, the case of *Child* v. *Baylie* (e) was decided, in which the Court say, " That the first grant or devise of a " term made to one for life, remainder to another, hath " been much controverted, whether such a remainder might " be good, and whether all might not be destroyed, by " the alienation of the first party; and if it were now " first disputed, it would be hard to maintain; but being " so often adjudged, they would not now dispute it." The doctrine, however, was not yet acquiesced in as settled law; for, in the case of *Hyde* v. *Parratt*, (f) in 1695, we find it sharply contested. Even at the present day, it is complained of, England, as contrary to the ancient common law, and opposed to sound principles.

On examining the old books, it will be found, that the Courts took a distinction between *a gift of a thing to use*, &c. and *a gift of the use and profits of a thing*, allowing a person to hold the thing, in trust, for the benefit of another. The first case to be found, in which that distinction is done away, is the case just cited from *Peere Williams*. By that decision, another breach was made in the ancient common

(a) 2 *Fearne on Con. Rem. and Exec. Dev.* 26. *Hargrave's Co. Litt.* Vol. 3, *p.* 20 *a*, *Note* 120. *Lond.* 8vo *edit.*
(b) 1 *Dyer* 7. *Brooke* 15.          (c) 1 *Br. Ch. Ca.* 188.
(d) 8 *Co.* 187. *Dub. edit.* 1793.          (e) *Cro. Jac.* 461.
(f) 1 *P. Wms.* 1.

law, and was the natural consequence of the decision in *Manning's* case.

At common law, there could be no entailments. A gift to a man, and the heirs of his body, was a conditional gift; and, upon the birth of such heirs, the condition was held to be performed, and the estate became absolute in the first donee. But the statute of Westminster the second converted this conditional fee-simple, as it was called, into a fee-tail.

It was soon found, however, that this statute was productive of innumerable hardships and embarrassments. The Courts, therefore, began to devise means to evade it, and to liberate estates from its shackles. For this purpose, fines and common recoveries, with all the curious learning attached to them, were introduced and supported. Parliament, also, interfered, and made estates-tail liable to forfeiture for high treason, and indirectly countenanced the conduct of the Courts. Thus, in the course of about three hundred years, the law upon this subject was restored to nearly what it was, before the statute of Westminster the second. This strikingly verifies the saying of the great Lord COKE, " That some time by acts of Parliament, and " some time by invention and wit of man, some points of " the ancient common law have been altered, or diverted, " from their due course ; yet, in revolution of time, the " same have been, with great applause, restored again." (*g*)

The Courts, in later times, aware of the difficulties and inconveniences, which resulted from the statute of Westminster the second, were apprehensive, that the doctrine laid down in *Manning's* case, and recognized in that of *Child* v. *Baylie*, would introduce like evils. Hence seemed to have arisen this principle, *that whenever the words made use of in the will, limiting an estate, would, by the construction*

(*g*) 3 *Co. Pref.* xvi.

but on *the statute of Westminster the second, amount to entail-
ment, the gift should be absolute in the first donee.* The
authorities in support of this principle are almost innumer-
able; but it may be sufficient to refer the Court to Mr.
Fearne's Essay on Executory Devises, where he has treated
this subject with his usual perspicuity. (*h*) The Courts,
however, becoming afterwards more disposed to support
those remainders, introduced whimsical distinctions, such
as " *dying without issue*," and " *dying without issue then liv-
ing*," and, to use the language of Mr. Fearne, " other al-
most imperceptible shades of difference." These distinc-
tions were kept up until very lately, when they seem to have
been exploded in the case of *Porter* v. *Bradley* (*i*) ; and all
difference betwen freehold estates and chattel interest was
destroyed. Well, indeed, might they do this ; for such had
become their avidity to support those limitations, that they
had, by their subtle distinctions, virtually done away the
salutary principle, just mentioned, which their predecessors
had established.

Thus, the common law of England, independent of the
statute of Westminster the second, is nearly the same,
with regard to the limitation of real, and of personal estate :
One may be as effectually embarrassed as the other.

This view of the subject naturally produces a suspicion,
that the principle is not only unsettled, but is in itself un-
sound. It has been progressing, more than three hundred
years, to arrive at that point, at which the opinion in the
last mentioned case places it.

In Connecticut, our Superior Court have, in several in-
stances, recognized the common law of England, with respect
to entailments of real estate, as the law of this state. In the

(*h*) 2 *Fearne on Cont. Rem. and Exec. Dev.* 145, 154, 233, 236,
239, *4th Lond. edit.* 1795.
(*i*) 3 *Term. Rep.* 143.

F

1805.

GRIGGS
*v.*
DODGE.

case of *Willis* v. *Olcott*, ( *j* ) the Court said, that the late " statute, admitting limitations in tail, as relative to the first " donee, might well be considered as in affirmance of the " common law." But the statute ( *k* ) evidently has reference to *real* estate ; it speaks of estates *in fee simple*, a term strictly applicable to lands only. Besides, sound policy forbids the application of the statute to personal property. Real estate has, in all countries, held a higher rank than personal ; contracts respecting it are entered into with more solemnity ; are executed with more formality ; the title to it is guarded with more care ; and the transfer of it is required to be more public and notorious. In this country, in particular, it has ever been considered good policy to keep property, especially personal estate, as free as possible from incumbrances and embarrassments ; that it may be transferred with facility ; that the possession may accompany the property ; that purchasers may not be deceived ; that false credits may not be obtained ; and that over-grown estates may not be accumulated in the hands of individuals, to the impoverishment of others who have equal claims, and in opposition to the principles of a free government.

It is common law, in England, to this day, that if personal estate is limited, by grant, in such way, as to create a contingent remainder, the first grantee may sell it, previous to the happening of the contingency, and wholly defeat the remainder man of his interest. ( *l* ) In the case at bar, the property was all disposed of, by the widow, before the marriage, and converted into money to her own " use and benefit." Whence arises the distinction between the two cases ? It must arises from the distinction attempted to be made between contingent remainders and executory devises ; a distinction, for which no substantial reason can be assigned. It was principally from the ignorance of the laity, that this distinction originated in England, at a time when few of

( *j* ) *Kirby* 118.                    ( *k* ) *Stat.* 24. *edit.* 1796.
( *l* ) 2 *Black. Com.* 263.—*Godb.* 42.

them could read or write; and when these attainments were deemed sufficient to atone for crimes, and to rescue from the halter. The intention of a man, who could make a will, was, therefore, regarded as sacred; and the Courts, in their solicitude to carry it into effect, departed from the rules of construction, which had been adopted with regard to grants. It is said by Fearne, that an executory devise is " only an indulgence to a man's will." (*m*)

In the case of *Hyde* v. *Parratt*, (*n*) a devise of goods to the testator's wife for life, then to his son, was held good, *in order the better to comply with the intentions of the testator.* And the same principle is recognized in the case of *Upwell* v. *Halsey.* (*o*)

II. But, although the English Courts have gone this length, for the reason given; yet no instance can be found in their law books, where such limitations have been allowed, unless the limitation is expressly recited in the will. In *Manning's* case, which is the basis of all the decisions on this subject, the devise was—" to M. Manning after the death of Mary, the testator's wife." The limitation in the case of *Hyde* v. *Parratt*, and in *Upwell* v. *Halsey*, is express. And Fearne, in the passage before quoted, describes an executory devise to be,—where personal estate is devised to one for life, *and afterwards is given over to somebody else.*

Indeed, so cautious have the English Courts been, of extending this doctrine, that in a multitude of decisions, they have suffered the limitation to be defeated by the act of the devisee for life. In a case in the 1st of *Dyer* 7, there was a devise to A. (the testator's eldest daughter) and the heirs of her body—remainder to C. (his second daughter) in tail. A. married, and died without issue; after her death, her husband sold the term. It was decided, that C. was with-

(*m*) 2 *Fearne on Cont. Rem. and Exec. Dev.* 2.
(*n*) 1 *Peere Wms.* 6.          (*o*) *Same book*, 651.

1805.

GRIGGS
v.
DODGE.

out remedy. Here the limitation depended on A.'s dying without issue, within the term. She married, and then died within the term, without issue ; after which, her husband aliened the term, and defeated C. of her remainder. In the same book, (h) " A termor devised his entire term, provided, that if the devisee died within the term, it should go to I. S. The devisee aliened the whole term, and died before it expired. I. S. was held to be without remedy. In *Everest* v. *Gell*, (q) there was a devise to A. for life, then to her neices ; and in case they should die without issue, then a limitation over ;—this was held to be too remote. And in *Rawlins* v. *Goldfrap*, (r) a similar principle was decided. In confirmation of this point, the case of *Butterfield* v. *Butterfield*, (s) *Beauclerc* v. *Dormer*, (t) *Seale* v. *Seale*, (u) and a great number of others collected in the *Digest of Chancery Reports*, p. 266, may be cited. It is also to be remarked, that most of the English cases are terms for years, &c. where the devise is of the thing itself.

From the foregoing authorities, it is evident, that the Courts will, in no case, *presume* a limitation. The moment this is undertaken, they run the risque of steering wide of the intention of the testator, and of course, of losing sight of the governing principle in decisions of this sort. If the English Courts have been thus cautious, in establishing remainders of personal estate ; much more ought our own Courts to guard against this mode of fettering that species of property. The policy of this State is against entailments, of every kind.

The case of *Smith* v *Gates* (v) is directly in our favour. That was an action on the case, brought by Smith, administrator *de bonis non* of Samuel Gates, deceased, against Noadiah Gates, Executor of Anne Gates, to recover a residuum of Samuel Gates's estate. The case

(h) *Page* 74.                    (q) 1 *Ves. junr.* 286.
(r) 5 *Ves. junr.* 440.          (s) 1 *Ves.* 133—154.
(t) 2 *Atk.* 308.                 (u) *Prec. in Ch.* 421.
(v) 2 *Root* 532.

was, Samuel Gates, after giving his wife Anne, the use of one third of his house, &c. during her natural life ; and after directing his debts, &c. to be paid, gave *whatever should remain of his estate to his said wife, to be used and improved by her, during her widowhood.* This residuum, amounting to 300*l.* and upwards, was paid to Anne, by the Executor of Samuel, and remained in her hands, unexpended, at the time of her death. Previous to her death, she made her will, and bequeathed *all her estate* to the first Ecclesiastical Society in East-Haddam. The Superior Court decided in favour of the plaintiff; but this Court reversed the judgment. It will not be easy to distinguish that case from the present in such a manner, as that the distinction shall operate against the plaintiff in error. In the first place, there is no difference in favour of *Smith* v. *Gates,* in the terms of the will. The devise there was,—*to Anne, to be used and improved by her, during her widowhood.* Here it is, " *I give and bequeath* " *to my wife Sarah, one third part of the whole of my estate,* " *for her use and benefit, so long as she remains my widow.*" The phrase—*for her use and benefit,* may have a more extensive signification, than the expression,—*to be used and improved.* Besides, Gates gave his wife *a residuum,* after having made liberal provision for her, in his will. Dodge made no other provision for his wife than what is contained in this bequest, the whole benefit of which, according to the construction of the Superior Court, would cease at the close of widowhood.

It is said, however, that in the case of *Smith* v. *Gates,* the widow *died unmarried ;* but in this case Mrs. Dodge *married ;* and the Court of Errors seem to insinuate, that if Mrs. Gates had married, the law would have been in favour of Smith.

In discussing this point, it is to be considered in the same light, as if the terms of the devise, in both cases, were exactly the same. The devise is *during widowhood.* In the case of *Smith* v. *Gates,* the Court decided, that, by the will,

an absolute estate so completely vested in Mrs. Gates, on the death of her husband, as that she could dispose of it by will. If once vested, can it be devested by a future event? Is it so, that a devise to a woman during widowhood vests an absolute property in her, if she takes care *to die a widow ;* but should she be so indiscreet as to close her widowhood *by marrying,* that the estate is not absolute, but subject to a defeasance? The Court say, however, that the will of the testator, in case of marriage, would have been certainly known. So his will would have been as certainly known, if widowhood had terminated by death. The intention here clearly is, so long as you are my widow, you shall use this property. But if a widow can dispose of it by will, this gives her, in that sense, the use of the property after her widowhood closes, and thus, strictly speaking, the will of the testator is contravened.

The Court go still further, and say, that the object of the testator, by the expressions used in the devise, is to prevent the estate from going into the hands of a stranger. But, if a widow, by remaining unmarried through life, obtains an absolute property by the devise, she has it in her power to throw the estate into the hands of a stranger by her will, as perfectly as she would have, by marrying. And the first Ecclesiastical Society in East-Haddam is as much a stranger to old Mr. Gates, in the legal sense of the word, as David Griggs is to Nehemiah Dodge.

It is also to be noticed, that the English Courts have availed themselves of slight circumstances, to found their decisions upon. In *Manning's* case the devise was to him, *in the first instance.* Fearne remarks on that case, that " the Court resorted to the grounds of the devise of the term on a *contingency or condition* being good, and the ability of the testator to dispose of it in the mean time ; and considered the devise over, after the death of the wife, as *such a contingency.* The nature of the devise in that case, accorded with this view of its effects, in the circumstance of the devise to B.

expressly *preceding* the intermediate bequest of the *use* and *occupation* to the wife." (*v*)

III. The plaintiffs in error contend, that the action is misconceived.

1. The action of account in this case, is not authorized by common law, nor by statute. No instance of the kind can be found in the English law books. Our statute does not warrant it. (*w*)

2. The action is brought against the husband and wife *jointly and severally.* They are summoned to render their account for the time they were jointly, and severally, the bailiffs, &c. They never were accountable *severally.* The wife, before marriage, was liable severally, if at all; but after marriage, if liable at all, it must be jointly. But the husband cannot be liable at all, except to render the account of his wife, previous to the marriage.

3. In an action of account, between Cyrel Dodge, one of the devisees of Nehemiah Dodge, and Sarah Dodge, widow of Nehemiah Dodge, a great question of property between all the heirs of Nehemiah Dodge is to be settled. None of those heirs, except Cyrel, is a party to this action. The Court and jury, then, will decide a question deeply interesting to persons not parties before the Court, and who never have had, and, of course, never can have, a day in Court. Besides, several questions of importance must be determined by auditors;—such as the extent of the accountability;—the amount of property used by the widow during widowhood;—what was necessary for her, &c.

4. If this property did not vest in the widow absolutely, it is *intestate,* and of course there must be an administrator; and the heirs would take in equal proportions, and the widow her dower.

(*v*) 2 *Fearne* 28.        (*w*) *Stat.* 27. § 6, 7. *edit.* 1796.

5. At any rate, distribution has never been made of this part of the estate ; and if it is limited over, it must be distributed among the devisees.  By whom, and in what manner, is this to be done ? We have no law on this subject, except statute law.  By the statute, there are only two modes of distributing estates, viz. by distributors appointed by the Court of Probate—and by agreement under the hands and seals of the parties.  Neither of these modes has been adopted here ; but instead thereof, distribution is to be made by *auditors*.

Further, if account will lie in this case, it presupposes that it must have been in the power of the widow to render her account voluntarily, and to settle the whole business, without the trouble and expense of a suit, or rather a great number of suits.  But, can she do this ? Suppose the devisees disagree about their shares ? How is the dispute to be decided ? And if any individual should disagree to the distribution, the whole would be frustrated, and the widow must be subjected to law-suits, whether she will, or not.  But, suppose the property had remained in the specific articles, at the time of the marriage, in what manner should she account ?  If the whole were in cattle, how could the different proportions be made out by her ?

It is clear, that to do justice to all parties, and save expense, the business ought to be done by the Court of Probate, according to the statute.  It might be added, that if any suit at all would lie for the account, it ought to have been a joint suit in the names of all the devisees, and the whole be settled at once.

6. There is no privity between the plaintiff and defendants.  Cyrel Dodge claims as a devisee of Nehemiah Dodge.  There is nothing in the will, which directs the defendants to account : It is, then, an implied accountability. Before the claim can be allowed, Cyrel Dodge must make

out a title to the property in the hands of the widow.— Without such title, he could not constitute a bailiff. His title cannot be made out here, but it must be settled, by preliminary proceedings, in the Court of Probate. Such proceedings, however, have never been had ; and not having legal evidence of a title, it is as no title at all. There is, therefore, no privity ; and without privity no action of account can be sustained. If the widow had died single, could account have been maintained against her executor or administrator ? It is also to be noticed, that it appears by the record, that here was real, as well as personal estate, which went into her hands, and all by virtue of the same devise. Now her usufructuary right in *that*, ceases upon marriage, as well as in the personal estate. This action, then, being brought only for the personal estate, does not settle the disputes between the parties. Besides, in what manner is the real estate to be distributed ? Can this be done without the aid of the Court of Probate ?

*Goddard*, for the defendant in error.

It would have been taken for granted, that, by the common law, as now settled and established by a series of adjudications in the courts in England, a remainder in personal chattels may be created, either by deed or will, but for the observations of the counsel opposed to me. But as remarks have been made, with a view to render this doubtful at least, and to evince that these courts have, in some cases, departed from the true principles of the common law, it may not be deemed improper to consider how the law is, and has been, in England, in relation to this subject.

It is admitted, that anciently, in that country, limitations of personal chattels to A. for life, or other term of time, remainder to B., were not favoured, or *generally* allowed ; yet such limitations, created after an estate for life, in last wills and testaments, were held to be good. A distinction was, indeed, taken between a bequest of the *use* of the chat-

G

tel, and when the chattel itself was given to the tenant for life; the latter being considered as vesting the property absolutely, in the tenant for life. But this distinction, as well as that between wills and deeds, has been long since done away. (*x*)

It may also be added, that there may be such a remainder of personal chattels, although no remainder man is definitely pointed out, by such deed or will. And in that case, the Court of Chancery in England, before which questions of this kind are settled, would decree, that the property should go to the relations of the testator, according to the statute of distributions.

In the case of *Harding* v. *Glyn*, (*y*) the testator devised his goods, furniture, chattels, &c. in Hatton garden, to his wife Elizabeth Harding, but desired her to give them to such of his relations, as she should deem most deserving. Elizabeth died without having executed the trust. It was decreed, that she took an estate for life, remainder to his relations, to be distributed according to the statute of distributions. In the first case, in *Peere Williams*, an attempt was made by counsel to revive the ancient distinction, between a devise or bequest of the use of a chattel, and the chattel itself for life, with remainder over; but that distinction was disregarded by the Court. In the case of *Davers and others* v. *Davers and others*, (*z*) personal estate was given to the wife of the testator *for life*, without saying any thing further, respecting the use of it; and the estate not being devised over to any other person, was decreed to go to the relations of the testator, according the statute of distributions.

In support of the general doctrine, in this case, *Tissen* v. *Tissen*, (*a*) *Lucas* v. *Evans*, (*b*) *Billings* v. *Sandom*, (*c*)

(*x*) 2 *Black. Com.* 398.   1 *P. Wms.* 290.
(*y*) 1 *Atk.* 469.                     (*z*) 3 *P. Wms.* 40.
(*a*) 1 *P. Wms.* 503.              (*b*) 3 *Atk.* 260.
(*c*) 1 *Brown Ch. Ca.* 394.

*Upwell* v. *Halsey*, (*d*) *Flanders* v. *Clark*, (*e*) and *Duke of Marlborough* v. *Godolphin*, (*f*) may be cited as cases in point.

1805.

GRIGGS
*v.*
DODGE.

But it is said, that whatever may be the common law, as now settled in England, on this subject, sound policy does not permit its adoption here ; and that the case of *Smith* v. *Gates*, decided in this Court, (*g*) is decisive of this point. In that case, the residue of the testator's estate, amounting to £318 : 4 : 5, was given to his " wife Anne, to " be used and improved by her, during widowhood." No person was pointed out by the testator's will, who should take, after the termination of Anne's widowhood. Judgment was rendered by the Superior Court, in favour of the administrator *de bonis non* of the testator, against the executor of the last will and testament of Anne, for the whole sum of £318 : 4 : 5. The judgment was reversed in this Court. In attending to the reasons given by the Court, for the reversal, it will be found, that so far from impugning the principles contended for by us, in this case, they rather favour those principles. In the very statement of the question, the Court seem to admit, that if Anne, the widow of the testator in that case, had *married again*, her interest in the bequest would have been *thereby defeated*. The question in that case is stated to be, " whether the bequest of the re- " siduum vested in the widow an entire and complete " property therein, *defeasible only on her marrying again ?*" The widow, in the case of *Smith* v. *Gates*, died without marrying again. In this case now under consideration, the widow married again, and thereby forfeited, or defeated, her interest in the bequest of her first husband.—The Court are made, in that case, further to say, " Whether " the property in question would, in case the widow had " married again, have revested in the heirs, it is not now

(*d*) 1 *P. Wms.* 651.
(*e*)1 *Ves. sen.* 9.
(*f*) 2 *Ves. sen.* 61.          (*g*) 2 *Root* 535.

" necessary to determine ; the will of the testator would,
" in that case, have been certainly known ; and that will
" ought to controul, so far as the policy of the law would
" admit." And the Court further say, that the evident
intention of the words, " to use and improve during widow-
" hood, &c." is to prevent the estate from going into the
hands of strangers.

It may, therefore, fairly be argued from the reasoning of
the Court in that case, that the doctrine we contend for, on
this occasion, is rather supported, than oppunged. But this
Court say, in that case, the judgment of the Superior Court
was, at any rate, wrong, in that, a recovery had been per-
mitted of the whole sum of £318 : 4 : 5—which, upon any
principles, is a greater sum than the facts warranted. So
that against the principles, which are claimed to govern the
case now under consideration, no decision of this Court has
been made.—Some allusion is, indeed, made, in that case, to
the old doctrine, that no remainder man is pointed out ;
even this does not affect our case.

But it is said, that sound policy does not permit us to
adopt the common law ; and, that perpetuities are against
the principles of our government.

It might here be remarked, that considerations of policy
may, with more propriety, be addressed to this Court, in
their legislative, than in their judicial, capacity.—We
come *here*, to know what the law *is*, not what it *ought to be ;*
to have it *pronounced*, not *made.*

But, suppose we examine into considerations of policy.
Wherein consists the impolicy of permitting a testator to
bequeath the use of his personal estate to A., and the es-
tate itself to B. ? In a country, which has grown rich in per-
sonal chattels, such provision may be quite as necessary, in
relation to personal, as to real, estate. In the case of *Shep-*

*hard* v. *Lessingham* (*h*) the Court say, " That, in bequests of this kind, a more liberal construction has been introduced than formerly prevailed, owing to the increase of personal estate, and its being extended to the uses of families." So long as all valuable wealth was supposed to consist in land, it was not deemed so necessary to permit provision to be made for a man's family, according to its circumstances, in personal estate ; but as this increased, and the whole fortune of many persons consisted of personal estate, the same necessity existed of permitting the father of a family, to make *suitable* provision for his children, and yet guard against profligacy, by his personal, as by his real, estate.

But, on this subject of policy, it is conceived, that the legislature of this State have not left it to courts of law, to wander in the wide field of conjecture, and decide how far encouragement of perpetuities may be disadvantageous, or otherwise. The legislature have defined their limits.

In the first paragraph of the "Act relating to the age, ability, " and capacity of persons," (*i*) it is enacted, " That all persons " of the age of twenty-one years, &c. shall have full power, " authority, and liberty, to make their wills and testaments, " and all other lawful alienations of their lands, *and other es-* " *tates.*" Having made this paragraph, the legislature, " with a full view of the dangers of perpetuities, of which we hear so much, have seen fit to add, *by way of proviso*, to the section just read, all the guard against perpetuities, which *they* deemed *politic*. This proviso is as follows : " And in order *to avoid perpetuities*, that no estate either in " fee simple, fee tail, or any lesser estate, shall be given, by " deed or will, to any person, or persons, but such as are in " being, or to the immediate issue or decendants of such as " are in being, at the time of making such deed or will, &c." Here, let it be remembered, that this proviso is attached to, and intended to controul the first section, which author-

(*h*) *Ambler* 122.　　　　(*i*) *Stat.* 23. *edit.* 1796.

1805.

GRIGGS
v.
DODGE.

izes persons to make all lawful alienations of their lands, " *or other estates*." Other estate includes personal chattels— from all which, one of two things is to be inferred ; either, that the terms, *estate, fee simple, fee tail, &c.* in the proviso, are not used in that narrow, limited, technical sense, which would confine them to land ; or, the legislature approved of the principles of the common law, as known and understood at the time of making the statute, and did not deem any guard against perpetuities being created in personal chattels necessary. In either alternative, the legislature have settled the question of policy ;—in the one, expressly ;—in the other, impliedly. The words, estate, fee simple, fee tail, &c. may be, and indeed are, used by lawyers, as applicable to personal chattels, as well as to land. In the very record now before the Court, the gentleman who drew up the plea in bar, has used the term *fee simple*, in relation to this very property. The learned, and correct Judge BLACKSTONE, in his Commentaries, (*k*) uses the term, estate tail, in relation to personal estate. Why may we not then suppose, that the legislature of Connecticut, when making use of these terms, in a proviso to an act, which related to the alienation of personal, as well as real estate, meant to make the proviso as broad as the act to which it is attached ? If this be a correct construction of this act, we have, in this State, the same authority for permitting a testator to give his *personal* estate to a person in being, and the immediate issue of such person, as his real estate. The authority, indeed, to do either, is rather implied, than expressly given, by this statute. The statute does not say, with respect to either, you may go so far ; but it says, you may go no further ; contemplating, doubtless, what the law was, at the time of making the statute, and aware that by the section to which this proviso is annexed, they authorized all " lawful alienations of lands, or other estate."—But, if the words in this proviso are to be confined to real estate, then it follows, that the legislature have authorized " *lawful alienations*" of personal estate, without any limitation or restric-

(*k*) *Page* 398, *before cited.*

tion. What alienations of personal estate were *lawful*, at the time of making this statute? Precisely such an one, as that now under consideration. At any rate, whether this does, or does not extend to personal chattels, it may safely be affirmed, that the legislature, in a full view of all the evils to be dreaded from perpetuities, have not thought fit to impose any other, or greater, restraints upon alienations of personal estates, than existed at common law: And this they might do, with great safety, well knowing, that, by the principles of that law, if an estate tail was attempted to be created in things personal, the absolute property " was " vested in the first, or any subsequent, possessor." (*l*)

1805.

GRIGGS
*v.*
DODGE.

Will this Court, then, hedge about personal property with restraints, which the legislature have not seen fit to impose; restraints, alike unknown to statute, and common, law?

Although in the course of this argument, it has been contended, that to support a limitation of personal property, it is not necessary that a remainder man should be pointed out; yet it is admitted, that to support *this action*, and the judgment of the Superior Court, in *this case*, it is necessary to shew, that a remainder man is pointed out, by the will of Nehemiah Dodge, deceased: For we bring our action, claiming as legatee, under the will. Let us, then, attend to this will, and ascertain whether Cyrel Dodge, the original plaintiff, was not entitled, under his father's will, to " one eighth part and two thirds of another eight part of " this personal estate, upon the intermarriage of Sarah " Dodge with David Griggs." It is an indisputable rule of construing wills, that the intention of the testator, collected from the whole instrument, shall govern. In this case, the testator, sets out, by declaring his intention to dispose of " such worldly estate as it had pleased God to " bless him with." Then follows the devise to his wife, Sarah, in these words: " I give and bequeath unto my be- " loved wife, Sarah Dodge, one third part of the whole of my

(*l*) 2. *Black. Com.* 398.

" estate, for her use and benefit, so long as she remains my
" widow." Next follows the clause in the will, under which
we claim, " I give my son, Cyrel Dodge, one eighth part, and
" two thirds of another eighth part, of my *estate.*" The
testator then proceeds to make provision for five other sons,
and gives to each " *one eighth part of his estate.*" To two
daughters he gives each " one half of one eighth part of his
estate," excepting twenty-five pounds, which is to be taken
from Lucy's part, and added to Deborah's ; and there is no
clause disposing of any *residue* of the testator's estate—Hence,
it is evident, that the word *estate*, which, technically speak-
ing, perhaps, imports only a man's interest in land, is used, by
the testator, in its broadest sense, and imports all the testa-
tor's interest in any property, real or personal. He evidently
meant to leave nothing intestate. And the broad sense, in
which he uses the term *estate*, is inferible from that clause,
which gives to his daughter Lucy, one half of one eighth
of his estate, excepting twenty-five pounds ; this twenty-five
pounds being, in his language, part of his *estate.* It is also
inferible from the whole tenor of the instrument. His in-
tention is apparent, that in the event of his wife Sarah mar-
rying again, her use should cease, and her interest in his
estate, both real and personal, should determine. And he,
also, evidently intended, in that event, that the third, which
his widow was to use and improve during widowhood, should,
upon her marriage, be divided among his children, by
eighths. It was a part of his *estate*, and, as such, he has di-
vided it out among his children. And let it be remarked,
that his widow held real, as well as personal estate, by the
same tenure, and by force of the same expressions in the
will. And who will say but what the real estate passed, by
the will, to the testator's children, subject to the use, during
widowhood, of his wife Sarah ? It is, therefore, clear, that if
Cyrel is entitled, by law, to any of the property, it must be
under the will, and in the proportion there pointed out.

But we are assailed with objections to the *form of action*,
in this case ; and it is said, that admitting we make out

our right, yet we have chosen an improper remedy to enforce it.

It is said, that an action of account will not lie. In England, almost all questions of this kind were settled in chancery, and a bill for an account was always exhibited : Such were the cases of *Lucas* v. *Evans*, (m) *Upwell* v. *Halsey*, (n) and many others. In this State, an action of account is brought at law, and no proceedings in chancery similar to those in England have been known regarding bills to account ; our statute, having, perhaps, limited the jurisdiction of courts of chancery. By statute, the action of account, is authorized in two or three specific cases, but not denied in others ; and immemorial practice sanctions bringing actions of account, in many other cases than those there specified. It is the fairest action for the defendant, permitting him always to go before auditors, and disclose, on oath, what disposition has been made of the property ;—how much has been consumed in use, and how much remains.

It is further objected, that the husband and wife are sued jointly and severally. This objection is not supported by the declaration. The action is brought against husband and wife, demanding their account, as well during the time that the wife was bailiff and receiver to the plaintiff alone, as during the time that husband and wife were joint bailiffs. But, if there is any thing in this objection, it could only have been taken advantage of, by a special demurrer to the declaration. It is, now, too late. The same answer may be given to most, if not all of the other objections, which have been urged against the form of this action. It is said, that if any action can be maintained it ought to be by all the legatees in the will, to prevent multiplicity of suits ; and if this action is sustained, important questions, affecting the rights of the other legatees may, and must, be settled, in an action to which they are not parties. To

(m) 3 *Atk.* 260.                    (n) 1 *P. Wms.* 651.

H

1805.

GRIGGS
*v.*
DODGE.

this it may be answered, that this plaintiff could not compel others to join in a suit—And it would be preposterous to say, that whether I shall obtain my right, in a court of justice, must depend upon the volition of persons, over whom I have no controul. Other cases continually arise, in which important *principles* may be established, which will operate upon those, who are not parties to the suit, in which they are settled. Suppose the testator had given two horses, of equal value, to two of his children. They are withheld from them. A. brings an action and recovers 50*l.* and B. brings his action and recovers but 10*l.* The parties, in these two cases, are entitled to the same, but have recovered *different*, sums. It might as well be argued, in that case, that A. and B. ought to have joined in a suit for the recovery of the value of two horses, as in this, that all the legatees under the will ought to join, because different auditors may give different sums to each.

It is further said, that there is no *privity* between the plaintiff and defendants, without which the action will not lie ; and it is added, that the plaintiff below ought to have made out his title before the Court of Probate, where this property ought to have been distributed among the legatees. To which it may be answered, That in this case, there is a privity between the plaintiff and defendants. Tenant for life of personal chattels has always been deemed a *trustee*, for the remainder man, and as such, is compelable to sign an inventory of the chattles ; and in some instances, to give security ; (o) and privity in estate is one of the inseparable incidents of a trust. (*p*) When the defendant, David Griggs married Sarah, the tenant for life, he took her *cum onere*, and became himself trustee of this property, and as such is bound to render his account. Bill to account was always brought in England against a trustee, and even against the executors or administrators of a trustee, or guardian, with an averment of assets, although *they* were not pri-

(*o*) 1 *Ch. Rep.* 110.            (*p*) 2 *Com. Dig.* 354.

vies. (*q*) But what, let it be asked, could a Court of Probate do in this case? No new administration can be granted. Nehemiah Dodge's estate is fully settled, and distributed. Sarah, the tenant for life of this property, was executrix to his will. The property in question vested absolutely in the legatees under the will, subject only to the use of the defendant Sarah, tenant during widowhood. When she married, their title to it was perfect, and could neither be fortified, nor impaired, by any thing, which a Court of Probate could do, more especially as it is averred, and admitted by the pleadings, that the property is all converted into money. We, therefore, trust, that the judgment of the Superior Court will be affirmed.

BY THE COURT, TREADWELL, *Lt. Gov.* NEWBERRY, AUSTIN, ALLEN, and EDMOND, *Assts.* dissenting, the judgment was affirmed. (*r*) As to the power of limitation, there was no difference of opinion, except as to the extent to which it should be carried: whether it should be restricted to such articles as stock, cash, &c. which perish not with the using, or should comprise every description of personal property, was a subject of some doubt. The majority, however, were of opinion, that the rule must be universal; and that it must be left to the discretion of mankind, to make the application. The principal division was on the question, whether the party, in this case, had resorted to his proper remedy.

(*q*) 2 *Com. Dig.* 111.
(*r*) The decision was delayed, until the case of *Taber* v. *Packwood, post,* in which the principal point was the same as in this, had been argued.