GILBERT W. CHAPIN, ADMINISTRATOR, vs. EMMA COOKE
ET AL.

First Judicial District, Hartford, May Term, 1900.
ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

The origin and history of the common and canon law in respect to gifts in restraint of marriage, reviewed.
A bequest or devise in restraint of a second marriage is not unlawful.
A testator directed the sale of all his estate and the payment of one half the income to his widow during her lifetime or until she should remarry, in lieu of dower, and the payment of the other half to certain relatives in specified proportions ; and then provided that "on the death of my wife" the property was to be divided among the aforesaid relatives in slightly different proportions. The widow remarried and is still living. In a suit to determine the validity and construction of the will, it was *held* that the interest of the widow, as well as the trust which was created solely in her behalf, ceased upon her remarriage; and that thereupon the other legatees, who took vested remainders in the shares given them, respectively, became entitled to a division of the entire estate.

Argued May 2d—decided May 22d, 1900.

Chapin v. Cooke.

SUIT to determine the construction of the will of E. Ludlow Cooke of Hartford, deceased, brought to the Superior Court in Hartford County and reserved by that court, *Robinson, J.*, upon an agreed finding of facts, for the consideration and advice of this court.

The testator died August 5th, 1897, leaving an estate of both real and personal property which was inventoried at $33,000, and a will which was duly proved by the Court of Probate for the district of Hartford on September 20th, 1897. The executor named in the will declined the trust, and the plaintiff, Gilbert W. Chapin, was duly appointed administrator with the will annexed.

After giving some legacies of trifling value the will reads as follows: "I appoint J. Coolidge Hills to act as administrator and trustee of my estate, no bond to be required of him. All my personal and real estate to be sold. The income of $\frac{6}{12}$ of my estate during the lifetime of my wife, or until she should marry, to be paid to her in lieu of dower. $\frac{4}{12}$ income to be paid to Mrs. Chas. Slocum, my niece, daughter of my sister Julia. $\frac{1}{12}$ to be paid to my brother, Stephen C. Cooke, and $\frac{1}{12}$ to be paid to Mrs. Ella Cooke Porter, daughter of my eldest sister.

"On the death of my wife the property to be divided as follows, viz:

"$\frac{6}{12}$ to be paid to my niece, Mrs. Chas. Slocum, daughter of my sister Julia.

"$\frac{3}{12}$ to be paid to my brother, Stephen C. Cooke, or his heirs, and $\frac{3}{12}$ to be paid to my niece, Mrs. Ella Cooke Porter, or her heirs.

"I appoint J. Coolidge Hills of the city of Hartford, County of Hartford and State of Hartford, executor of this my last will and testament."

All the beneficiaries named were living at the death of the testator.

Stephen C. Cooke died in 1898, intestate, leaving a widow, Emma Cooke, and three children; the said Emma Cooke died subsequent to the commencement of this action. The widow of the testator, Ella E. Cooke, married J. Henry

Hawes of San Francisco, California, on March 16th, 1899, and is still living.

The real estate has been sold in accordance with the direction of the will; the general legacies have been paid; and there remains in the hands of the administrator for distribution, in accordance with the terms of the will, personal estate amounting to more than $15,000.

The complaint asks the Superior Court to adjudicate upon the following questions: —

Was the interest in the estate bequeathed to the widow determined by her marriage?

What distribution shall be made to the brother and nieces named, (1) if the interest of the widow was determined by her marriage; (2) if her marriage did not determine her interest?

Did the gift of $\frac{3}{12}$ of the testator's estate to Stephen C. Cooke vest in him upon the testator's death?

All persons in interest were made parties to the complaint, and the widow, Ella E. Hawes, appeared and contested the validity of the condition annexed to the bequest to her.

*William Waldo Hyde,* for the plaintiff.

*Walter H. Clark* and *William A. Arnold,* for Ella E. Hawes.

HAMERSLEY, J. Contracts will not be enforced which are contrary to sound public policy. The courts have considered contracts totally restraining one from marriage, or from marrying any but a particular person without imposing an obligation to marry that person, to be of this nature. 1 Sw. Dig. 212. In such case the mere abstinence from marriage is not unlawful, but the compulsion to celibacy is impolitic; and so neither party to an attempt at such compulsion can invoke the aid of a court of justice in the enforcement of an obligation involving a violation of its own maxims of sound public policy.

But this rule of the law of contract did not at common law limit the freedom of one in making a gift of his own prop-

erty. A gift, in pursuance of the general law regulating the transfer of property, to a person while he remained unmarried, was lawful, and was not treated as a compulsory obligation in total restraint of marriage. The donee retained his freedom of choice, and the donor had no power of compulsion. The donee had no interest in the thing given, beyond that derived from the donor's bounty as expressed in the terms of the gift; he assumed no obligation to remain unmarried, but on the other hand, he acquired no right of protection in the possession of property to which he had no moral nor legal claim, unless he chose to comply with the condition. Such a gift did not require the aid of a court to enforce an obligation to remain single; it needed only a recognition of the limitations of a mere benefaction. Possibly a case might happen where the question would arise whether the transaction were really a gift or a contract; but if it were plainly a gift, the rights of the donee, both legal and moral, were limited by its terms.

So a gift of land on condition the donee shall not marry, was valid, unless the condition were repugnant to the estate granted, as in the case of an estate tail. 1 Cruise's Dig. Tit. 13, Ch. 1, § 23. The same rule prevailed in case of a gift by devise. In stating this law Mr. Cruise adds: "Conditions in restraint of marriage are . . . so far discouraged by the English law, that they are construed strictly in favor of the person on whom such restraints are laid." Id. §§ 48, 55. This last expression must be taken in connection with the nature of the restraint; for any condition that is plainly harsh, unjust and unwise, would invite a strict construction in favor of him on whom it is laid. This state of the English common law, and distinction between contracts and gifts in restraint of marriage, is affirmed in *Phillips* v. *Medbury,* 7 Conn. 568, 573.

The civil law, which largely influenced the canon law of England, was different. The general rule was that a condition, whether precedent or subsequent, in restraint of marriage, attached to a gift by devise, was void; and a devise of real or personal estate upon such condition would take

effect free from the condition. Such condition was held to be unlawful, and "what is unlawful to be done, the law will have us to understand as impossible to be done," and a legatee cannot be held to perform an "impossible condition." But a "possible condition," which is not void in law, whatever it may be, "is to be observed as a law by him on whom it is enjoined, or otherwise take its due effect." Godolphin's Orphans' Legacy, 44, 45, 291. The rule of the common law as to gifts (including devises of land) made upon conditions in restraint of marriage, was reasonably clear; so was the rule stated by Dr. Godolphin in 1676 as the rule of the canon law. Devises of land were within the jurisdiction of the common-law courts; gifts of personal estate were within the jurisdiction of the ecclesiastical courts, in which the canon law was authority. The court of chancery had a concurrent jurisdiction in respect to dispositions of both kinds. The court of chancery, as well as the common-law courts, administered substantive law in accordance with the principles of the common law of England, and were jealous, perhaps unduly, of the encroachments of the civil law. Naturally, in the effort of chancery to administer the common law without wholly disregarding the canon law, and to find some common ground applicable to cases the jurisdiction of which was concurrent with the ecclesiastical courts as well as to cases the jurisdiction of which was concurrent with the common-law courts, exceeding confusion and diversity of opinion arose. The controversy centered in cases where devises or bequests ("devise" and "bequest" were then often used promiscuously) were on condition the recipient married with consent of a person named—a condition valid by the common law, void by the canon law. The differences are illustrated in the language of the Master of Rolls in 1731 (*Peyton* v. *Bury*, 2 Wms., Peere, 626, 628), Lord Hardwicke in 1743 (*Pulling* v. *Reddy*, 1 Wils. 21), Chief Justice Willes in 1738 (*Hervey* v. *Aston*, Willes Rep. 83, 93), Lord Mansfield in 1767 (*Long* v. *Dennis*, 4 Burr. 2050, 2055), Ashhurst, J. in 1786 (*Doe* v. *Freeman*, 1 T. R. 389), and in many other cases. In 1788 Lord Thurlow said: "The early cases refer in general to the canon law,

as the rule by which all legacies are to be governed. Towards the latter of the last and beginning of the present century, the matter is more loosely handled; the canon law is not referred to, as affording too positive a rule, but these conditions are treated as partaking of the force allowed them by the law of England, but at the same time as unfavorable to the good order of society; at length it became a common practice that such conditions were only *in terrorem.* I do not find it was ever seriously supposed to be a testator's intention to hold out the terror of that which he never means to happen; but the court has made such conditions amount to no more." And further: "About the middle of the present century, doubts arose which divided the opinions of the first men of the age. The difficulty seems to have been in reconciling the cases. The prevailing opinion was, that devises of land should follow the rules of the common law, and legacies of money the rules of the canon law. The question remains unresolved, what is the nature and extent of the rule. . . . It is agreed on all hands that (however restrictive of marriage) when the legacy is given over to other uses, the testator shall be deemed to regard those uses." *Scott* v. *Tyler*, 2 Bro. Ch. 431, 487, 488.

The question of the nature and extent of the rule still remains unresolved. On this point there is still no controlling concensus of opinion; and there is not likely to be until the cases of generally admitted authority are treated upon some principle consistent with truth and self-respect. Mr. Cox, in his note to *Peyton* v. *Bury, supra*, published in 1790, says: "The general rule in regard to personal legacies, seems to be that the conditions in restraint of marriage, whether precedent or subsequent, shall be void, unless there be a devise over, in which case, the right of the devise over shall prevail; but interests arising out of land shall be governed by the rules of the common law in respect to conditions." It is patent that if a condition, whether precedent or subsequent, is unlawful, its unlawful character cannot properly be changed by any further disposition of the thing given in case of forfeiture. The statement of Mr. Cox is practically

a different form of putting the rule *in terrorem* commented on by Lord Thurlow. In discussing the application of that rule in *Hervey* v. *Aston, supra,* Lord Chief Justice Willes says: "I would endeavor to make this rule a reasonable and intelligible rule if possible; and I think it can be made so in no other way than by considering a devise over as evidence of the intent of the testator, without determining that this intent cannot be expressed in any other way. When, therefore, it is said that the devise is only *in terrorem*, it is laid down, not as a rule of equity that these devises can be only *in terrorem*, but that if there be no devise over it shall be taken that the testator intended it to be only *in terrorem*, and so is only an evidence of his intention; but when he expresses his intention to be otherwise, it would be absurd to say that he intended it to be *in terrorem*." *Hervey* v. *Aston* was one of the most thoroughly argued and carefully considered of this class of cases. It seems to have influenced Lord Thurlow in his treatment of the same subject in *Scott* v. *Tyler.* It was heard by the Lord Chancellor, assisted by Lee, Lord Chief Justice of the King's Bench, Willes, Lord Chief Justice of the Common Pleas, and Sir J. Comyns, Chief Baron of the Exchequer, receiving the unanimous assent of the chief of the Court of Chancery and of each of the common-law courts.

In this State we have had no occasion to consider, for the purpose of deciding any case, the principle which should be our guide in applying these cases of commonly admitted authority. It is not necessary to do so in the present case, and we do not mean to imply an opinion on that subject. We have considered the origin and treatment of the rule claimed in behalf of the widow, only so far as it seemed appropriate to show that the rule cannot affect the principle on which we decide this case.

For the purposes of this decision, we may assume the general rule to be as claimed: that when a condition in restraint of marriage is annexed to a legacy as a condition subsequent, the condition is valid if there is an express immediate gift over, and is void if there is no such gift over; we may also assume that the gift in question is one of personal property,

that the will expresses a condition subsequent rather than a limitation, and that there is no express gift over. Assuming this, we think it clear that the interest of the widow in the bequest to her ceased upon her marriage. This result fol-lows from the settled doctrine that the general rule relied on has no application to second marriages. It is true that *dicta* appear in several cases intimating a contrary view, and they seem to have influenced JUDGE REEVE to some extent in a brief reference to this subject in his work on Domestic Rela-tions, p. 222, and also JUDGE SWIFT (1 Sw. Dig. s. p. 141) in a passage based on the *dictum* of Ashhurst, J., in *Doe* v. *Freeman*, *supra*, a *dictum* uncalled for by the point decided. The passage in Swift was urged upon this court in *Phillips* v. *Medbury*, and rejected. Notwithstanding such occasional unguarded expressions, and an apparent conflict between some American cases, we think the doctrine is settled in England and in this State by the authority of adjudged cases, and that these cases rest upon solid reason.

The general rule arose from an effort of the Court of Chancery to reconcile the differences between the canon law and the common law, in cases where the two systems clashed. It was a device of the opportunist, which should not be ex-tended beyond the necessity of the occasion. It was not in-tended for and never was applied to cases where the two systems were in harmony. At common law, when uninflu-enced by the doctrines of the canon law, any gift, whether of personalty or real estate, could be limited by a condition in restraint of marriage, whether of a first or second mar-riage. There was no question of legality, but only of intent. The condition was valid, whether it restrained an unmarried daughter from any marriage without consent of others, or a widow from a second marriage.

So far as second marriages were concerned, the canon law was in entire harmony with the common law. "Although a condition directly contrary to marriage, annexed to a legacy in a will, is a void condition for that very reason, yet the civil, or rather the canon law, doth distinguish in this point between a virgin and a widow, and says, that such condi-

tions against marriage (as to a virgin) are void; but allows them as to widows." And the rule in respect to females holds the same in reference to males. Godolphin's Orphans' Legacy, p. 382. A condition in restraint of a second marriage was therefore equally valid by the common law and canon law. No device was necessary to assimilate the two systems. The freedom of a testator's bounty—whether its subject was land or chattels—was in this respect unhampered by either.

It is impossible to justify the application of an arbitrary rule which determines a testator's intent without reference to his actual intention plainly appearing in the will, which was admittedly adopted for the purpose of giving some practical effect to the canon law in cases where it differed from the common law, to those cases where both common and canon law are at one in putting no restraint on the freedom of the testator's bounty. And so are the adjudged cases. The lawfulness of a condition that a widow shall not marry, or of an annuity during widowhood, is broadly stated by Lord Thurlow in *Scott* v. *Tyler, supra.* In 1876 the English Court of Appeal affirmed the principle laid down by Lord Thurlow, in the strongest terms. *Allen* v. *Jackson,* L. R. 1 Ch. Div. 399. In the opinions of the judges it is stated that a condition in restraint of a second marriage is valid, whether the gift be by a husband or a stranger, whether made to a husband or a wife; that there is no rule of public policy against limiting gifts to a widow or a widower until a second marriage takes place; that it never has been decided that the general rule in respect to conditions in restraint of marriage, attached to legacies, applies to second marriages; and the court holds that the rule cannot be so applied.

In *Smith* v. *Gates,* 2 Root, 532, 535, and in *Griggs* v. *Dodge,* 2 Day, 28, the lawfulness of the limitation of gifts by restraint on second marriages is referred to, seemingly with approval, but the question was not directly involved nor decided. In *Phillips* v. *Medbury,* 7 Conn. 568, the question was ably argued by counsel, and set at rest in a vigorous opinion delivered by CHIEF JUSTICE DAGGETT. The court holds that

the doctrine declaring restraints upon marriages in wills void, as made *in terrorem*, does not apply to a widow.    This case is affirmed in *Bennett* v. *Packer*, 70 Conn. 357, 360.    Here there was no devise over.    The gift was of personal as well as of real estate.    The general rule of strict construction, applicable to legacies in restraint of marriage, was expressly discarded, and it was held that the testator intended his gift to be during widowhood; that upon the subsequent marriage the estate of the widow was determined *ipso facto*, the land descending to the heirs and the personal property being intestate estate; that the gift being in lieu of dower, the widow was not entitled to dower, but that she was entitled to her distributive share of the intestate personal property.    *Chappel* v. *Avery*, 6 Conn. 31; *Ingersol* v. *Knowlton*, 15 id. 468, 473; *Sheldon* v. *Rose*, 41 id. 371.

There is some diversity among American decisions on this question, but as our own law is so firmly settled there is no need of attempting an analysis of the cases.    We incline to think the weight of authority is in accord with the law as settled in England and in this State.    2 Jar. on Wills, 564.

There remains the question of the disposition of the *corpus* upon the determination of the widow's estate; in this question the widow has no interest.

The will is very informal, and evidently was drawn by one unacquainted with the technical language of the law.    It gives the residue of the estate to a trustee, and directs him to pay one half the income to the testator's wife, and the other half to his brother and nieces (in the proportions specified) "during the lifetime of my wife, or until she should marry"; and further directs the trustee to divide the *corpus*, "on the death of my wife," between the same brother and nieces in a proportion differing somewhat from that governing their enjoyment of the income; the difference arising from adding to the share given to the brother and nieces, respectively, in the proportion indicated by their enjoyment of the income, one third each of the one half of the *corpus* burdened by the widow's interest.    The intention seems entirely clear, that the distribution of the income by the trustee, both

to the blood relatives and to the wife, should continue for the same period, that is, until the death or prior marriage of the wife; in other words, until the interest of the wife in one half the income should be terminated either by death or marriage; and that then the whole estate should be divided between the brother and nieces. There is indicated no possible reason for the trust except to charge the whole estate with the payment of the wife's annuity during its continuance; when the annuity ceases the sole purpose of the trust ceases, and the direction to the trustee to divide the estate between the brother and nieces takes effect. This intention cannot be defeated because the testator, in referring to the determination of the wife's estate says, " on the death of my wife," instead of repeating in full the language by which he had just before limited the duration of that estate. Even if the language were more doubtful we would be bound to give effect to an intention thus plainly inferable from the provisions of the will. *Mansfield* v. *Mix*, 71 Conn. 72, 77; *Kellogg* v. *Mix*, 37 id. 243, 247.

Upon the death of the testator the brother and nieces took a vested interest in the shares of the estate given to them respectively.

Questions as to the administration of the estate of the brother now deceased are improperly included in this complaint.

The Superior Court is advised : That all interest of Mrs. Cooke, the widow of the testator, in the residue of the estate, was determined upon her marriage; and that the fund now in the hands of the administrator should be distributed as follows: one half to Mrs. Charles Slocum, one quarter to the estate of Stephen C. Cooke, and one quarter to Mrs. Ella Cooke Porter.

In this opinion the other judges concurred.